815 A.2d 517 (2003)
357 N.J. Super. 387
STATE of New Jersey, Plaintiff-Respondent,
v.
Richard OVERTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 22, 2002.
Decided February 7, 2003.
*518 Mark E. Roddy, Atlantic City, for appellant.
David Samson, Attorney General of New Jersey, for respondent (Kristen McKearney, Deputy Attorney General, of counsel and on the brief).
Before Judges PRESSLER, CIANCIA and AXELRAD.
The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
We consider in this appeal whether a person in a somnambulistic state, i.e., sleepwalking, can be criminally culpable for his acts committed in that state.
Defendant, Richard Overton, was indicted for four offenses arising out of a single incident against the same victim, I.T., a seven year-old girl: first-degree attempted aggravated sexual assault, N.J.S.A. 2C:5-1 and 2C:14-2a(1) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2b (count two); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a (count three); and fourth-degree child abuse, N.J.S.A. 9:6-3 (count four). The jury acquitted defendant of counts one and two, and convicted him of counts three and four. Defendant's motion for acquittal notwithstanding the verdict (n.o.v.) on counts three and four was denied. The court sentenced defendant on count three to a term appropriate for a crime one degree lower than that for which he was convicted, N.J.S.A. 2C:44-1f(2), of three years imprisonment, and imposed a concurrent nine-month term on count four. Appropriate monetary penalties were imposed, along with Megan's Law community supervision for life. Defendant was admitted to bail pending appeal.
On appeal, defendant argues:
I. THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT ON COUNTS THREE AND FOUR OF THE INDICTMENT, IN THAT NO REASONABLE JURY COULD HAVE CONCLUDED THAT THE DEFENDANT WAS GUILTY OF THE ABOVE-MENTIONED COUNTS.
II. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION *519 FOR A JUDGMENT OF ACQUITTAL ON COUNTS THREE AND FOUR OF THE INDICTMENT IN THAT THE NOT GUILTY VERDICTS RENDERED WITH REGARD TO COUNTS ONE AND TWO WERE LEGALLY, MORALLY, AND LOGICALLY INCONSISTENT WITH THE GUILTY VERDICTS RENDERED ON COUNTS THREE AND FOUR, IN THAT PREDICATE CRIMINAL ACT FOR COUNTS THREE AND FOUR WAS THE ATTEMPTED SEXUAL ASSAULT PROSECUTED IN COUNTS ONE AND TWO.
III. THE TRIAL COURT ERRED IN CONCLUDING THAT EXISTING CASE LAW "COMPELLED" THE COURT'S DENIAL OF THE DEFENDANT'S APPLICATION FOR A PROBATIONARY SENTENCE.
We are not convinced by defendant's first and second arguments that he is entitled to an acquittal on counts three and four because of insufficiency of the evidence or inconsistency with the verdicts on counts one and two. However, in making these arguments, defendant points to comments by the prosecutor in summation that the jury could believe defendant's testimony that he was sleepwalking and still convict him of child endangerment and child abuse, suggesting those convictions could be based upon a culpability state below "knowing", the mental state required for these offenses. Because defense counsel made no objection to the prosecutor's comments at trial, the standard of review is plain error. R. 1:7-2. We are satisfied these comments, which misstated the law, had the clear capacity to produce an unjust result. R. 2:10-2. Accordingly, we reverse defendant's convictions and remand for a new trial on counts three and four. Because of this disposition, we do not address defendant's third argument.

I.
I.T. was the granddaughter of defendant's girlfriend, Mrs. Brown. On November 28, 1998, she and her five-year old brother slept over her grandmother's house. I.T. awoke with her pants down around her ankles to find the forty-one year-old defendant, smelling of alcohol, naked on top of her, moving around with his penis pressed against her vagina. When she screamed, he stopped moving around and asked her what she was doing in his bedroom and she explained he was in hers. Defendant then covered himself with the bedspread, and he dashed out of her room, leaving her in tears.
The children slept at Brown's house on numerous occasions during the previous year while their mother worked the night shift. The house was a rancher, containing three bedrooms, one of which was turned into a den where the children would sleep, usually on the floor. The master bedroom, where Brown and defendant slept, was located at the other end of the house. On the night of the incident, after the children were in bed, Brown and defendant shared one or two beers. They went to bed naked. The couple intended to have sexual relations the next morning and Brown reminded defendant they would need to get the baby oil, which was located in the back bedroom or bathroom across from the children's bedroom. Defendant responded he would retrieve the oil at some later time. Brown and defendant went to sleep, and Brown was awakened to defendant crying and yelling while standing in front of their bedroom window naked and covered in baby oil. In response to her repeated demands as to what had happened, defendant stated "he woke up naked next to [I.T]."
Brown found I.T. and her brother sitting on the floor in the den playing a video *520 game. I.T. told her "Big Ricky [tried] to put his thing ... in [her] private parts," pointing in the direction of her genital area. Brown called defendant's sister, Grace Green, who lived nearby. When Green arrived a few minutes later, I.T. told her "Ricky tried to pull her pants down" and she "told him to stop." Based upon this conversation, the women telephoned I.T.'s mother and took the child to the hospital. The examination failed to reveal any evidence of penetration.
Defendant testified that earlier in the evening he had a beer with Brown and another one when he went out to buy a pack of cigarettes and a six-pack of beer. Because of work and his father's illness and family commitments he had only had three hours sleep over a two-day period. He and Brown had a discussion in bed about him getting the baby oil if he wanted to have sexual relations. Defendant dozed off next to Brown and his next memory was waking up next to I.T. and asking her "what the hell are you doing in our bedroom[?]" I.T. informed him he was in her bedroom. Realizing he did not have any clothes on, defendant grabbed a blanket and ran out of the room.
His defense, corroborated by Green, Brown, and a former girlfriend, Maria Rodriquez, was that he had a sleep disorder which, on numerous occasions, caused him to wake up in a place other than his bed with no recollection of how he got there. Green testified that while growing up, defendant would occasionally be found sleeping in different areas of the house, such as under the dining room table. According to Rodriquez, during her ten-year relationship with defendant in the 1980's, while defendant was sleeping, he would wander into another room and often put food in his mouth and lie back down to sleep. On several occasions she had to wake him so he would not choke on the food. Brown testified she had awakened on several occasions to find defendant "balled up naked and in front of the basement door," lying in the kitchen, lying across the bed "covered from head to toe with baby powder," and lying in the bathroom "with his long johns wrapped around his neck." One time defendant turned on all the burners on the stove and fell asleep on the floor.
Defendant presented the testimony of Dr. Doghramji, a psychiatrist with additional board certifications in sleep medicine, who was qualified as an expert witness in the field of sleep disorders. Doghramji treated defendant after his arrest. He opined that defendant was a sleepwalker based on the information he received from defendant and Brown, which indicated a history of repetitive sleep activities. He further testified that erratic sleep patterns, the amount of caffeine defendant consumed, and psychological distress were consistent with, and contributed to, a sleeping disorder.

II.
The statute pertaining to child endangerment, N.J.S.A. 2C:24-4a, provides in pertinent part:
Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child, or who causes the child harm that would make the child an abused or neglected child as defined by R.S. 9:6-1, R.S. 9:6-3 and P.L. 1974, c. 119, § 1 (C.9:6-8.21) is guilty of a crime of the second degree.
Under N.J.S.A. 9:6-3, the provision governing child abuse, "[a]ny parent, guardian, or person having the care, custody or control of any child, who shall abuse ... such child ... shall be deemed to be *521 guilty of a crime of the fourth degree." Child abuse is then defined as "the performing of any indecent, immoral or unlawful act or deed ... that may tend to debauch ... or degrade the morals of a child..." N.J.S.A. 9:6-1.
Because N.J.S.A. 2C:24-4a and N.J.S.A. 9:6-3 are silent regarding the required mental state, the gap filler provisions of N.J.S.A. 2C:2-2c(3) come into play and require the State to prove defendant acted "knowingly" to convict him of endangering the welfare of a child and child abuse. State v. Demarest, 252 N.J.Super. 323, 327, 599 A.2d 937 (App.Div.1991). For a person to act knowingly with respect to the nature of his conduct or the attendant circumstances, he must be aware of the nature of his conduct or the presence of such circumstances or of a high probability they are present. N.J.S.A. 2C:2-2b(2). To act knowingly with respect to a result of his conduct, a person must be aware that his conduct is practically certain to cause such a result. Ibid.
The child endangerment and child abuse statutes require a conscious and knowing action by defendant. N.J.S.A. 2C:24-4a; N.J.S.A. 9:6-3. The modifying language of "which would impair or debauch the morals of a child," N.J.S.A. 2C:24-4a, or "that may tend to debauch ... or degrade the morals of a child," N.J.S.A. 9:6-1, is merely a consequence of that act. To convict defendant of child endangerment, the State had to prove beyond a reasonable doubt that defendant knowingly engaged in sexual conduct which would impair or debauch I.T.'s morals, or knowingly caused I.T. harm that would make her an abused or neglected child. Thus, defendant had to be aware that he engaged in the sexual conduct or had to be aware that his conduct was practically certain to cause I.T. the required harm. To convict defendant of child abuse, the State had to prove beyond a reasonable doubt that defendant knowingly performed any indecent, immoral or unlawful act or deed that may have tended to debauch or degrade I.T.'s morals. Thus, defendant had to be aware that he performed such an act.
The State's position was that the jury should not believe defendant's claim of sleepwalking and should find, based on I.T.'s testimony, that he drank some beer and knowingly had sexual contact with his girlfriend's seven year old granddaughter. In his summation, however, the prosecutor stated:
Defendant told us he was there aware of the sleepwalking history he had. And from [Mrs.] Brown he was there getting up three or four times a week, if you believe that. Tells us how much he cares about the welfare of these children, then he tells us he goes to sleep naked knowing that he gets up and walks around the house, knowing there's no lock on his door, knowing those children don't have a lock on their door. Something doesn't add up there about being so concerned. It's endangering the welfare of those children, even if you believe everything that he said which I submit you shouldn't.

[Emphasis added.]
There was no objection by defense counsel to these comments and no curative instruction was given by the court at that time. In the final charge, the judge defined the requisite mental state of knowingly several times, and properly noted the State had the burden of proving that the offense committed by defendant was the result of a voluntary act. The judge explained this principle and discussed defendant's claim of sleepwalking:
[A] person is not guilty of a crime unless his liability is based upon conduct which includes a voluntary act of which he is physically able....

*522 As I indicated throughout my charge on the substantive elements of the offense[s], the acts with which Mr. Overton [w]as charged require a purposeful, knowing act or conduct on his part. In other words, the State must prove that Mr. Overton was consciously aware of the circumstances in which he placed himself and it was his conscious object, conscious intention to act in a particular way.
The defense has presented evidence in this case that Mr. Overton suffers from a disorder called parasomnia or sleepwalking. Although this may be characterized as a defense, you should understand that such evidence goes directly to those elements that the State must prove beyond a reasonable doubt.... Once any credible evidence has been raised placing the defendant's mental state in question, the State must disprove such evidence beyond a reasonable doubt because our law requires that... these alleged acts were conducted consciously, purposely and knowingly by... the defendant.
These instructions comport with N.J.S.A. 2C:2-1a. They were sufficiently tailored to the facts of the case and might have been adequate to guide the jury if not for the prosecutor's comments. However, the judge failed to charge the jury in accordance with the model charge that it must disregard any statements by the attorneys as to the law which conflict with the judge's charge.[1]
Criminal liability is conditioned, at a minimum, upon a voluntary act and a culpable state of mind. State v. Breakiron, 108 N.J. 591, 596, 532 A.2d 199 (1987); N.J.S.A. 2C:2-1 and -2. The act required by N.J.S.A. 2C:24-4a and N.J.S.A. 2C:9:6-3, in the factual context here presented, is the alleged sexual contact by defendant with I.T. in her bedroom. To support criminal liability, that act had to be voluntary. If the act was committed by defendant in a sleepwalking state, it was not voluntary, and cannot underpin convictions of these offenses. Under such circumstances, defendant could not have known what he was doing. On retrial, the jury should be clearly instructed on this point.
The prosecutor misstated the law when he told the jury it could find defendant guilty of these two offenses based solely on his "act" of going to bed naked with no lock on his bedroom door, with two children sleeping in the house, knowing he had a propensity to sleepwalk. Thus, according to the prosecutor's implication, even if defendant never intended to wander into I.T.'s bedroom and engage in improper acts with her, and, in fact, due to his somnambulistic state he was unaware he had even left Brown's bed, the jury could still convict him of child endangerment or child abuse. That is not so. This conduct could, at best, constitute recklessness, namely, a conscious disregard of a substantial and unjustifiable risk that the prohibited sexual contact would result. N.J.S.A. 2C:2-2b(3). Such reckless conduct cannot support a conviction for child endangerment or child abuse.
Because of the content of the prosecutor's comments, because they were not objected to by defense counsel and were not corrected by the court, and because the judge did not instruct the jury to disregard any statements by the attorneys *523 about the law that were inconsistent with the judge's charge, the possibility of an unjust result is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). We cannot discern with confidence whether the jury rejected defendant's sleepwalking evidence and found that defendant knowingly and voluntarily engaged in the improper acts in I.T.'s room, or whether the jury accepted that defendant was sleepwalking and did not act knowingly and voluntarily in I.T.'s room, but earlier created a risk that the improprieties might occur. The former scenario would properly support a conviction while the latter would not.
Our conclusion is bolstered by the colloquy during the motion for judgment of acquittal n.o.v. Defense counsel acknowledged he had not realized the implications of the prosecutor's comments during trial and had not objected. He argued that the State's summation
could have easily steered some of the jurors in a wrong direction, steered them in a way inconsistent with [the court's] instructions ... [because] the State was telling them, is it's endangering the welfare of the children to put them in a situation where you have an adult male who knows that he sleep walks, at least on this particular occasion went to bed without clothes on, because of the possibilities of what could conceivably happen.... But that's not what the law says.
The judge agreed that the jury could have returned a guilty verdict on the third and fourth counts based on the fact defendant knew he had a propensity to sleepwalk, and thus should not have gone to bed naked or without locking his bedroom door:
And conceivably the jury could have felt that the defendant, even though he was in a somnambulous state could have endangered the welfare of the child by walking around naked knowing the children were there and they could have returned, as they did return a verdict of guilty of endangering the welfare of a child.
....
With respect to the fourth count, the child abuse, again the jury could have taken into consideration the no lock on the door, the defendant walking around, even though he was in a sleepwalking state, should have locked the door, did something other than having no locking mechanism on the door and should . . . not have done what he did, walking around, laying next to the child. And the jury's verdict was guilty.
Although the trial judge apparently recognized the jury's potential confusion with respect to the knowing and voluntary act requirements of the offenses, nevertheless, he denied defendant's motion for a judgment of acquittal n.o.v.

III.
We are unpersuaded by defendant's inconsistent verdicts argument. The jury returned guilty verdicts on the third and fourth counts, charging child endangerment and child abuse, despite acquitting defendant of the first two counts, charging him with attempted aggravated sexual assault and sexual assault. Courts are cautioned against setting aside inconsistent or illogical verdicts and from speculating as to whether such inconsistencies resulted from jury lenity, compromise, or mistake not adversely affecting the defendant, when the reason for their inconsistency cannot be determined. Dunn v. United States, 284 U.S. 390, 393-94, 52 S.Ct. 189, 190, 76 L.Ed. 356, 359 (1932);
*524 United States v. Powell, 469 U.S. 57, 65, 105 S.Ct. 471, 476, 83 L.Ed.2d 461, 468 (1984). That is the case here, and defendant has not established these particular grounds for reversal of his convictions. We note that the first two counts required a finding of purposeful conduct, a higher mental state than the knowing conduct required for counts three and four. N.J.S.A. 2C:5-1; N.J.S.A. 2C:14-2a(1); N.J.S.A. 2C:14-2b. This alone could explain the different results.
Defendant's convictions are reversed and the matter is remanded for a new trial on counts three and four.
NOTES
[1] The judge instructed the jury that it was "required to accept and be controlled by the law as stated by the Court" and that "counsel's comments on the facts [during summation] represent only their recollection of the testimony [and] if it does not agree with your recollection, you are under a duty to disregard it and rely exclusively on your own recollection."